# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
May 31, 2018 Session

## STATE OF TENNESSEE v. ROSEMARY L. DECOSIMO

**Appeal by Permission from the Court of Criminal Appeals
Criminal Court for Hamilton County
No. 287934   Paul G. Summers, Senior Judge**

_____

**No. E2017-00696-SC-R11-CD**

_____

In this appeal of a certified question of law, the defendant challenges the constitutionality of a statute that imposes a fee upon persons convicted of certain drug and alcohol offenses when forensic scientists employed by the Tennessee Bureau of Investigation ("TBI") have conducted chemical tests to determine blood alcohol or drug content.  The challenged statute earmarks the fees imposed to an intoxicant testing fund, and monies within this fund do not revert to the State's general fund but "remain available for appropriation to the [TBI] as determined by the [G]eneral [A]ssembly."  Tenn. Code Ann. § 55-10-413(f)(3)(B) (2017).  The defendant argues that this statutory scheme provides TBI forensic scientists with a personal and institutional financial incentive to produce blood alcohol test results that secure convictions, which, in turn, increases fees and funding for the TBI.  Relying on Tumey v. Ohio, 273 U.S. 510 (1927); Ward v. Vill. of Monroeville, 409 U.S. 57 (1972); and Connally v. Georgia, 429 U.S. 245 (1977), the defendant asserts that these financial incentives create an appearance of impropriety and deprive her of the federal and state constitutional right to a fair and impartial trial.  We conclude that, under both the federal and state constitutions, the standards of neutrality announced in Tumey, Ward, and Connally apply only to persons exercising judicial or quasi-judical authority and do not apply to TBI forensic scientists, who do not exercise such authority.  Furthermore, even if the Tumey standards applied to TBI forensic scientists, the defendant's constitutional claim would fail because, as salaried employees, the TBI forensic scientists have no direct, personal, substantial pecuniary interest in fees imposed pursuant to the statute, and any institutional financial interest the TBI forensic scientists may have as a result of the statute is too remote to give rise to an appearance of impropriety. We also disagree with the Court of Criminal Appeals' holding that the statute violates substantive due process by creating a situation analogous to an expert witness contingency fee arrangement.  Accordingly, the judgment of the Court of Criminal Appeals is reversed, and the judgment of the trial court is reinstated.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Criminal Appeals Reversed; Judgment of the Trial Court Reinstated**

CORNELIA A. CLARK, J., delivered the opinion of the court, in which JEFFREY S. BIVINS, C.J., and SHARON G. LEE, HOLLY KIRBY, and ROGER A. PAGE, JJ., joined.

Herbert H. Slatery III, Attorney General and Reporter; Andrée S. Blumstein, Solicitor General; Jonathan David Shaub, Assistant Solicitor General, for the appellant, State of Tennessee.

Jerry H. Summers, Benjamin McGowan, and Marya Schalk, Chattanooga, Tennessee, for the appellee, Rosemary L. Decosimo.

Stephen Ross Johnson, Brennan M. Wingerter, and William Gill, Knoxville, Tennessee, and Joseph S. Ozment, Memphis, Tennessee, for the amici curiae, National Association of Criminal Defense Lawyers and Tennessee Association of Criminal Defense Lawyers.

## OPINION

### I. Background

This appeal involves a challenge to the constitutionality of a statute that imposes a $250 "blood alcohol or drug concentration test (BADT) fee" [hereinafter "BADT fee statute"] on every person convicted of certain statutorily specified offenses,[1] including driving under the influence, if the offender "has taken a breath alcohol test on an evidential breath testing unit provided, maintained and administered by a law enforcement agency for the purpose of determining the breath alcohol content" or the offender "has submitted to a chemical test to determine the alcohol or drug content of the blood or urine." Tenn. Code Ann. § 55-10-413(f)(1) (2017).[2] Clerks of "the various

---

[1] The other offenses to which the BADT fee statute applies are vehicular assault, aggravated vehicular assault, vehicular homicide, simple possession or casual exchange of a controlled substance, reckless driving, and aggravated vehicular homicide. Tenn. Code Ann. § 55-10-413(f) (2017).

[2] The General Assembly first enacted a statute in 2005 imposing a blood alcohol concentration test fee of $100. 2005 Tenn. Pub. Acts, ch. 483, § 7 (codified at § 55-10-419 (2005)). In 2006, the General Assembly changed the name of the fee to BADT fee. Tenn. Code Ann. § 55-10-419 (2006); 2006 Tenn. Pub. Acts, ch. 998, § 2. In 2010, the General Assembly increased the BADT fee from $100 to $250, based on the TBI's recommendation. See Tenn. Code. Ann. § 55-10-419 (2010); 2010 Tenn. Pub. Acts, ch. 1020, §§ 1, 2. At the time of the defendant's arrest and indictment, the BADT fee statute was codified at Tennessee Code Annotated section 55-10-419 (2012). On July 1, 2013, the relevant statutory provisions were transferred to Tennessee Code Annotated section 55-10-413(f). 2013 Tenn. Pub. Acts, ch. 154, § 13. This statute was subsequently amended in 2016 and 2017, but these

courts of the counties" collect BADT fees and forward them monthly to the state treasurer for deposit into "the Tennessee bureau of investigation (TBI) toxicology unit intoxicant testing fund" [hereinafter "Intoxicant Testing Fund"]. Id. § 55-10-413(f)(2), (f)(3)(A). Monies deposited in the Intoxicant Testing Fund "shall be invested pursuant to [Tennessee Code Annotated section] 9-4-603" and "shall not revert to the general fund of the [S]tate, but shall remain available for appropriation to the [TBI], as determined by the [G]eneral [A]ssembly." Id. § 55-10-413(f)(3)(B). Money in the Intoxicant Testing Fund shall be used, "to the extent permitted by federal law and regulation, to fund a forensic scientist position in each of the three (3) [TBI] crime laboratories, to employ forensic scientists to fill these positions, and to purchase equipment and supplies, pay for the education, training and scientific development of employees, or for any other purpose so as to allow the [TBI] to operate in a more efficient and expeditious manner." Id. § 55-10-413(f)(3)(C). Any additional available funds in the Intoxicant Testing Fund "shall be used to employ personnel, purchase equipment and supplies, pay for the education, training and scientific development of employees, or for any other purpose so as to allow the bureau to operate in a more efficient and expeditious manner." Id.

The defendant, Rosemary L. Decosimo, challenged the constitutionality of section 55-10-413(f) after her arrest in the early morning hours of August 18, 2012. She consensually provided a blood sample upon her arrest, and this blood sample was submitted to the forensic services division of the TBI for analysis. Nothing in the record reflects that the defendant had an additional blood sample procured for independent testing as permitted by statute. See Tenn. Code Ann. § 55-10-408(e) (2017) ("The person tested shall be entitled to have an additional sample of blood or urine procured and the resulting test performed by any medical laboratory of that person's own choosing and at that person's own expense; provided, that the medical laboratory is licensed pursuant to title 68, chapter 29.").

The TBI is comprised of three divisions—the criminal investigation division, the forensic services division, and the narcotics investigation division. Tenn. Code Ann. § 38-6-101(a)(2) (2014). The TBI's forensic services division "consist[s] of experts in the scientific detection of crime." Tenn. Code Ann. § 38-6-103(a) (2014). These experts are salaried state employees.[3] The forensic services division must "establish, authorize,

amendments did not change any of the statutory provisions relevant to the constitutional issue presented in this appeal. See 2016 Tenn. Pub. Acts, ch. 876, § 10; 2017 Tenn. Pub. Acts, ch. 16, §1. However, by an amendment effective May 21, 2018, the General Assembly substantially revised the provisions of the BADT fee statute at issue in this appeal. See 2018 Tenn. Pub. Acts, ch. 1044, §§ 3, 4. Therefore, citations in this opinion reference the version of Tennessee Code Annotated section 55-10-413(f) (2017) in effect prior to the 2018 amendment.

[3] The record includes an exhibit listing four categories of TBI forensic scientists and providing the following salary ranges for these positions, as of May 1, 2014: (1) $33,108 to $51,372; (2) $45,324 to $70,320; (3) $49,500 to $76,788; and (4) $58,752 to $91,140.

approve and certify techniques, methods, procedures and instruments for the scientific examination and analysis of evidence, including blood, urine, breath or other bodily substances, and teach and certify qualifying personnel in the operation of such instruments to meet the requirements of the law for the admissibility of evidence." Id. § 38-6-103(g). "When examinations, tests and analyses have been performed in compliance with these standards and procedures, the results shall be prima facie admissible into evidence in any judicial or quasi-judicial proceeding, subject to the rules of evidence as administered by the courts." Id.

The results of the TBI's forensic services division's testing of the blood sample the defendant provided showed the defendant's blood alcohol content at 0.16%. In May 2013, the Hamilton County Grand Jury charged the defendant with five driving offenses,[4] including driving under the influence ("DUI") with a blood alcohol content above 0.08%, which constitutes DUI per se. See Tenn. Code Ann. § 55-10-401(2) (2017).[5]

On January 31, 2014, the defendant filed a motion to dismiss, or in the alternative, to suppress the TBI's blood alcohol test results. She challenged the constitutionality of the BADT fee statute, arguing that by conditioning imposition of the BADT fee upon conviction and earmarking the monies to the Intoxicant Testing Fund, rather than to the State's general fund, the BADT fee statute incentivizes TBI forensic scientists to generate test results that produce convictions and BADT fees. The defendant argued that such a statutory system gives rise to an appearance of impropriety that violates her fundamental right to a fair trial guaranteed by both the Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution.

Twenty-two other persons charged in Hamilton County with an offense for which a BADT fee would be assessed upon conviction also filed motions to dismiss their indictments and suppress the results of blood alcohol testing. These persons had provided either a blood or breath sample to law enforcement. Blood samples were sent to the TBI forensic services division for testing. Breath samples were tested by a model EC/IR II breath analysis machine calibrated, maintained, and certified by the TBI. These persons raised the same constitutional challenge to the BADT fee statute as the defendant.

---

[4] The defendant also was charged with failing to yield, violating the driver's license law by not having a driver's license in her possession, failing to keep her vehicle in a single lane of traffic, and driving under the influence.

[5] This statutory provision has not changed since the defendant's arrest; thus, we cite the current statute.

On August 1, 2014, three judges of the criminal courts for Hamilton County held a single joint hearing on all of these motions. At this joint hearing, counsel for the defendants acknowledged that the constitutional claim involved no allegations of actual unfair or inappropriate action on the part of any TBI forensic scientist and that no evidence of that sort would be presented at the hearing. Rather, the defendants explicitly premised their constitutional challenge solely on "the appearance" of impropriety and the "potential" for abuse resulting from the BADT fee statute creating in the TBI and TBI forensic scientists a "financial interest" to obtain convictions of certain offenses and collect BADT fees.

As evidence to support this constitutional claim, the defendants introduced a transcript of the testimony that former TBI Director Mark Gwyn ("Director Gwyn") provided the General Assembly's Senate Judiciary Committee on February 11, 2014. Director Gwyn provided the following overview of revenue generated from BADT fees and TBI expenses for forensic testing of blood alcohol and drug content from 2009 to 2012:

- 2009 – Revenue: $999,000 and Expenses: $750,000
- 2010 – Revenue: $1,011,000 and Expenses: $690,000
- 2011 – Revenue: $1,500,000 and Expenses: $1,400,000
- 2012 – Revenue: $2,500,000 and Expenses: $1,500,000

He explained that the total surplus of $1,600,000 for this four-year period had been used on equipment and training. He stated that, "[i]n 2008, we were faced with some pretty deep cuts, cuts that would have at least caused us to do one of two things: [w]e would've had to shut down some disciplines with[in] our crime laboratory, or we would've had to start charging local law enforcement for testing." To avoid those options, the TBI asked the General Assembly to increase the BADT fee from $100 to $250. Director Gwyn acknowledged that the TBI had "no way to project how many" BADT fees would be collected in a given year or "what type of expenses are going to go out." Director Gwyn emphasized that "[f]orensic testing is very expensive." By increasing the BADT fee, Director Gwyn said that the TBI had been able to avoid "lay[ing] off forensic scientists" and had also avoided passing the cost of forensic testing "back onto local law enforcement [which] could not pay it at the end of the day."

When one state senator asked Director Gwyn whether earmarking BADT fees to the TBI via the Intoxicant Testing Fund might provide an inappropriate incentive for the TBI to do extra testing and raise additional money for its expenses, Director Gwyn responded, "Absolutely not. There's no way to do any extra testing." The same senator then asked whether depositing BADT fees into the State's general fund might be preferable, as it would avoid any appearance of impropriety or basis for believing that the BADT fee was a "revenue-generator." To this comment, Director Gwyn responded:

Yes. I mean, I think someone can say almost anything they want to say. You know, does a patrol officer out here calibrate his radar gun so it shows someone speeding at a higher rate of speed to write a ticket to generate revenue from tickets?

I think we just have to let our testing stand on its own. There's been plenty of trial and defense attorneys that have taken our toxicology and our blood alcohol exams, outsourced them to private laboratories.

Unfortunately, we had one incident in the Chattanooga area where a young forensic scientist made a mistake. He paid for that mistake. He was dismissed. We've outsourced all of the cases that [the dismissed forensic scientist] had worked. We have 2,000 of them back, and there's been no other mistake.

So, obviously, we don't want the appearance that we're doing anything wrong. We're an open book. We're as transparent as it can be, and we welcome anybody to come in and outsource any type of testing that they would like to see.

We just felt like that, on a conviction, part of the court fee could go to this so that we would not have to bring it back on local law enforcement and hurt them in that way, with some of them not being able to fund [these tests]. This type of testing is very expensive.

The [BADT fees were] not meant to make [the] TBI rich. And, as you can see, with a million and something left over, that could be used up probably in about two instruments within the laboratory.

So, but, at the will of whatever the [L]egislature thinks, you know, obviously, I will abide by that. But, you know, and I guess that's the best answer. I mean, we don't want any negative hanging over our head, obviously.

Another defense exhibit at the joint hearing contained the TBI's financial report for the Intoxicant Testing Fund. This report reflected (consistently with Director Gwyn's testimony) that revenue from the Intoxicant Testing Fund had been used to support "TBI operating expenditures in all its divisions, which include travel, training, supplies and equipment" and that "[i]n any given year, when revenue exceeds expenditures, those [surplus] funds are reserved, as directed by Tennessee Code Annotated."

Director Gwyn provided written stipulations in lieu of a personal appearance and testimony at the joint hearing. Director Gwyn stated that increasing the BADT fee from $100 to $250 in 2010 had been "necessary to offset state budget cuts that would have severely hampered state law enforcement efforts." He stated that, in fiscal year 2008-2009, "the actual cost to [the] TBI for each test of bodily fluids for ethyl alcohol was approximately $84," and "[the] cost for each test of bodily fluids for drugs was approximately $275." Director Gwyn estimated that eight special agent positions and eight special agent/forensic scientist positions "were in jeopardy" if the BADT fee had not been increased.

Director Gwyn also clarified that the ethyl alcohol retesting performed by an independent lab at the flat fee of $35 for each sample among the large batch of samples initially tested by a TBI forensic scientist who mistakenly switched two blood samples was "not comparable with the total toxicological services" the TBI provides. For example, he explained that this flat $35 rate "did not include any courtroom testimony" and that the scope of the testing "was clearly defined and restricted to ethyl alcohol—a luxury that [the] TBI is not afforded." According to Director Gwyn, between thirty-five and forty percent of samples submitted to the TBI for toxicological analysis "require a full drug screen in addition to ethyl alcohol analysis." Director Gwyn also characterized courtroom testimony provided by TBI forensic scientists as "a significant expense due to employees' time spent preparing to testify, travel time, fuel and vehicle expenses, hotel and per diem if necessary, employees' time spent waiting to testify, and actual testimony time." He stated that, over the prior six months, TBI forensic scientists had "spent an average of 80.6 hours per month testifying about test results as expert witnesses." Because testifying is a significant part of a TBI forensic scientist's job, the TBI spends "significant time and money training to maintain the expertise of these employees," including an annual training budget for the toxicology unit of $60,000. New employees are required to train for twelve-to-eighteen months before they are allowed to work independently, and during training they receive "a salary without producing case work."

Director Gwyn reiterated that BADT fees "are used for all TBI agency operational costs as permitted by Tennessee's statutes." He also reiterated that, even though a defendant is assessed a single BADT fee upon conviction, "[t]he conviction may be based on a breath alcohol analysis, a blood alcohol analysis performed on the subject's bodily fluid sample, a drug screen performed on the subject's bodily fluid sample, or a combination of testing. The type of testing performed is unrelated to the fee."

The defense also introduced as exhibits TBI documents titled "Budget Presentation" for fiscal years 2010-2011, 2011-2012, 2012-2013, and 2013-2014. These documents had been provided to the Senate Judiciary Committee of the Tennessee General Assembly, along with an oral presentation by Director Gwyn and other TBI personnel. In fiscal year 2010-2011, the TBI had a total budget request of $63,000,000,

and the forensic services division had conducted 270,000 laboratory tests on 83,000 pieces of evidence. In fiscal year 2011-2012, the TBI had a total budget request of $64,970,600, and the forensic services division had conducted 315,600 laboratory tests on 80,000 pieces of evidence. In fiscal year 2012-2013, the TBI had a total budget request of $66,000,000 and the forensic services division had conducted 331,125 laboratory tests on 82,872 pieces of evidence. In 2013-2014, the TBI had a total budget request of $70,000,000. The record does not contain information about the number of tests the forensic services division conducted that fiscal year.

The defendants also presented evidence about the TBI forensic scientist who had been fired for switching two blood samples.[6] According to the proof, this forensic scientist failed to follow TBI protocol and mistakenly switched two blood samples. This mistake resulted in a person with an actual blood alcohol content of 0.01% being charged with vehicular homicide based on the other person's blood alcohol content of 0.24%. When the State discovered the error, it moved to dismiss the charge. The TBI fired the forensic scientist and sent all samples he had tested to an outside laboratory for retesting. In a letter introduced as a defense exhibit, TBI Assistant Director Robert Royse stated:

> On October 3, 2013[,] TBI was notified of a discrepancy in blood alcohol testing results. Both an independent and an internal reanalysis of the data associated with these samples indicate that [a single forensic scientist] inadvertently switched two blood tubes at the time of analysis. While all indications were that this was an isolated incident, confidence in the results issued by our Laboratory is of paramount importance to the TBI.
>
> Therefore, arrangements were made for an independent laboratory to reanalyze every positive Blood Alcohol Analysis performed by this examiner. Through the State of Tennessee's competitive bidding process AIT Laboratories was awarded the contract for retesting, which totaled 2,827 samples. The scope of this independent laboratory retesting was to determine if any samples had been switched by [the forensic scientist]. Review of these 2,827 retested samples indicates that in all other cases the correct blood sample was originally analyzed by TBI.

The defendants emphasized that there were variations between the results of the TBI testing and the results of the independent laboratory retesting. In some cases, the independent laboratory retesting showed a blood alcohol content of less than the 0.08% threshold necessary for DUI per se or less than the 0.20% threshold necessary for enhanced punishment. The State responded that in most cases the independent laboratory

---

[6] The defendants were allowed to present this proof even though they were not alleging any actual misconduct or mistakes in the handling and testing of their own samples.

retesting reflected blood alcohol content levels higher than the TBI's initial testing results. Additionally, TBI Assistant Director Royse explained:

> Some variation should be expected between any two scientific measurements. When comparing the retested data one must consider that ethyl alcohol is a volatile compound and many factors such as sample age, volume of sample available for retesting, sample condition, and the number of times the blood tube has been opened may influence the results. Additionally, it must be noted that the supplied TBI result is the lower of two analyses and has been truncated from four decimal points supplied by the analytical instrument down to two decimal places for reporting purposes; therefore any statistical comparison between truncated and non-truncated data may be problematic.

Also testifying at the joint hearing for the defendants were two defense attorneys specializing in DUI defense. Attorney Raymond W. Fraley, who practiced law in Lincoln County at the time of the hearing in 2014, had handled over 2000 DUI cases. Mr. Fraley described the increased emphasis on the results of forensic testing of blood and breath samples in DUI prosecutions and the increased number of offenses and penalties that can be established with proof of blood alcohol test results alone. Mr. Fraley opined that TBI test results greatly influence judges and prosecutors and often determine whether a defendant goes to trial or enters a guilty plea. Mr. Fraley viewed the BADT fee statute as impinging on the right to a fair trial. He did not consider cross-examination of TBI forensic scientists about the BADT fee statute a sufficient safeguard, partly because eighty-five percent of DUI cases settle prior to trial. Mr. Fraley also disagreed that the availability of independent testing of blood and urine samples[7] sufficiently protects a defendant's right to fair trial. He characterized independent testing as "moderately inexpensive" and said that, in his experience, most clients who had consumed any alcohol before being stopped did not pursue independent testing. Mr. Fraley estimated that only fifteen to twenty percent of his clients seek independent testing, and he theorized that errors in TBI forensic testing are likely often never discovered because of the infrequency of independent testing. Mr. Fraley acknowledged, however, that of his clients who had sought independent testing, none of the independent test results had ever differed from the TBI's initial test results. Mr. Fraley also acknowledged that the TBI has implemented a policy of duplicate testing of blood samples, which he characterized as "good science."

Attorney Lloyd Levitt, who practiced in Hamilton County and had handled over 1000 DUI cases at the time of the hearing in 2014, described the TBI's blood alcohol test results as "the driving factor in any DUI case." Mr. Levitt stated that a 2012 change in

---

[7] See Tenn. Code Ann. § 55-10-408(e).

Tennessee law mandating blood tests when an impaired person kills or injures another person resulted in "a huge increase in blood testing." According to Mr. Levitt, the increased number of blood samples submitted for testing after the 2012 change in the law had overwhelmed the TBI forensic services division and had resulted in a four to five month delay in receiving results from blood alcohol testing. Receipt of test results could be delayed for more than a year if retesting was required. Mr. Levitt agreed that the increased number of blood samples submitted for forensic testing had translated to the TBI receiving more money from the $250 BADT fee assessed upon each conviction.

At the conclusion of the hearing, defense counsel acknowledged that no evidence of actual TBI bias had been presented and that no evidence had been offered to establish that TBI forensic scientists manipulate blood alcohol tests to generate more convictions and more BADT fees. The defendants contended, however, that they had shown an appearance of impropriety and that this showing was sufficient to establish the statute's constitutional invalidity. The defendants maintained that the separate statute declaring TBI test results prima facie admissible in any judicial or quasi-judicial proceeding exacerbates the appearance of impropriety created by the BADT fee statute. See Tenn. Code Ann. § 38-6-103(g). The defendants argued that, just as paying a trial judge a $250 bounty for each conviction violates the state and federal constitutional due process guarantees, so too does paying the TBI a $250 bounty contingent upon conviction.

By a single order entered December 11, 2014, the three trial judges denied the defense motions for suppression and dismissal but granted the defendants the right to a jury instruction concerning the financial interest the BADT fee statute creates in the TBI obtaining convictions. In so holding, the trial judges described the TBI's financial interest in BADT fees as "not negligible" and "very large" in the aggregate. The trial judges nevertheless rejected the defendants' constitutional challenge, explaining:

> Presumably, it is impossible to calibrate breath-test machines to overstate any positive result. Thus, no financial interest on the calibrator's part can affect the results of breath tests.

> As for blood tests, presumably, despite the evidence of acknowledged and unacknowledged errors in blood tests, it is impossible to calibrate blood-test machines to overstate any positive result. The sole acknowledged error in the record was a transposition error; perhaps the unacknowledged errors in the record lie within the margin of error. Presumably, too, despite the statement in the reports in the record that "[t]he above represents the interpretations and opinions of the analyst[,"] blood tests are subject to minimal, if any, interpretation or opinion.

Although deliberate falsifications attributable to financial interest remain a possibility, presumably, what protects defendants from accidental transposition errors also protects them from deliberate falsifications: the availability of independent analysis of blood, at state expense in appropriate cases, and the availability of underlying "technical notes and data" that, according to a statement in the reports in the record, the laboratory maintains in its case records. Thus, the financial interest in obtaining DUI convictions is offset by financial and other interests in continuing to have employment and avoiding criminal liability, making the possibility of a deliberate falsification attributable to financial interest remote without necessarily changing defendants' calculations regarding the advisability of independent analysis.[8]

After this order was entered, the trial judge initially assigned to Ms. Decosimo's case retired, and two successor trial judges recused themselves. Senior Judge Paul G. Summers was then designated to hear the case, and the defendant renewed her motion. The defendant relied on the evidence presented at the August 2014 hearing, but she also introduced evidence from the TBI's March 3, 2015 budget hearing before the General Assembly's Senate Judiciary Committee, as well as letters and charts from the Tennessee Department of Revenue containing data about BADT fee collections from 2005 to 2016. BADT fees collected over this *eleven-year* period totaled $22,059,970.90. In his March 3, 2015 testimony before the Senate Judiciary Committee, Director Gwyn stated that the TBI had a total *annual* budget of $70,000,000.00. Other TBI officials testified that same day that BADT fee collections averaged approximately $3,000,000 per year—less than five percent of the TBI's total budget. In one letter, a representative of the Department of Revenue explained that no data showed "which portion of the total amount of the BADT fees collected is the result of a DUI or reckless driving conviction" and that no data showed the year of conviction because court costs may be paid "in installments over time," meaning "the BADT fee may be spread out over multiple years, or even not paid at all if the individual is unable to pay the court costs."

Upon considering all the evidence, the Senior Judge denied the defendant's renewed motion for suppression and dismissal. The defendant then entered a nolo contendere plea to DUI per se and reserved the following certified question of law for appeal:

---

[8] The trial court judges granted the defendants' consolidated motion for an interlocutory appeal, but the Court of Criminal Appeals denied the application for an interlocutory appeal, and this Court also denied the defendants' application for permission to appeal. State v. Repass, No. E2015-00336-CCA-R9-CD (Tenn. Crim. App. July 9, 2015), perm. app. denied (Tenn. Oct. 16, 2015). The trial court judges dismissed as untimely the State's application for an interlocutory appeal, noting that the State could still file an extraordinary appeal under Tennessee Rule of Appellate Procedure 10.

Whether the trial court erred in not dismissing this case, or alternatively, suppressing the blood alcohol evidence without which the State could not proceed against the defendant on this DUI per se conviction, where T.C.A. § 55-10-413(f) is unconstitutional in violation of due process and rights to a fair trial under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution and under article I, sections 8 and 9 of the Tennessee Constitution based on the fact that the [TBI] receives a $250 BADT/BAT fee in every case in which a conviction is obtained for driving under the influence or other listed offense, wherein a TBI blood test or TBI-calibrated breath test result is used, thereby creating a "contingent-fee-dependent system" susceptible to bias because the TBI's testing and interpretation of these tests play the determinative role in the prosecution of the charge, and a jury instruction regarding this statutory incentive in favor of conviction is insufficient to cure the magnitude of the constitutional violation.[9]

The State dismissed all other charges against the defendant.

The Court of Criminal Appeals resolved the certified question by holding that the BADT fee statute violates "due process principles." State v. Decosimo, No. E2017-00696-CCA-R3-CD, 2018 WL 733218, at *8 (Tenn. Crim. App. Feb. 6, 2018), perm. app. granted (Tenn. Mar. 21, 2018). The intermediate appellate court began by reviewing three decisions of the United States Supreme Court: Tumey v. Ohio, 273 U.S. 510 (1927); Ward v. Vill. of Monroeville, 409 U.S. 57 (1972); and Connally v. Georgia, 429 U.S. 245 (1977). It described these decisions as holding that judges may not, consistent with due process, "have a direct or indirect pecuniary interest in the litigation before them." Decosimo, 2018 WL 733218, at *10-13. The Court of Criminal Appeals determined, however, that this due process principle applies only to persons performing adjudicatory functions and does not apply to TBI forensic scientists, who typically serve as expert witnesses and perform no "judicial or quasi-judicial functions." Decosimo, 2018 WL 733218, at *14.

Nevertheless, the Court of Criminal Appeals chose not to end its analysis there, commenting that it "[could] not ignore the fact that, pursuant to . . . section 55-10-413(f)(2), the TBI receives a fee for each conviction where a blood or breath test is

---

[9] Although the certified question is framed as challenging the entire BADT fee statute, including the portion that provides for imposition of a BADT fee in cases involving a "TBI blood test or TBI-calibrated breath test result," the defendant submitted only a blood sample, and the proof offered at the joint hearing focused on blood samples not breath samples. Nevertheless, our analysis and rejection of the defendant's facial constitutional challenge to the statute is not dependent on the type of sample involved and applies with perhaps even greater force to breath tests, where the only role TBI forensic scientists have is calibrating, maintaining, and certifying the breath analysis machines.

- 12 -

performed but does not receive a fee if a defendant's charges are dismissed or reduced or if a defendant is acquitted." Decosimo, 2018 WL 733218, at *16. The Court of Criminal Appeals determined that the BADT fee statute creates in the TBI "a direct pecuniary interest in securing convictions." Id. It described the BADT fee statute as "a mechanism whereby the TBI forensic scientists have a pecuniary interest in BADT fees in the form of continued employment, salaries, equipment, and training within the TBI." Id. The intermediate appellate court analogized "the close relationship between the BADT fees and the operational expenses of the TBI . . . to an expert witness contingency fee" and pointed out that this Court had already held such arrangements void because they encourage bias. Id. (citing Swafford v. Harris, 967 S.W.2d 319, 323 (Tenn. 1998); Tenn. Sup. Ct. R. 8, RPC 3.4(h); Crowe v. Bolduc, 334 F.3d 124, 132 (1st Cir. 2003)). Although the Court of Criminal Appeals acknowledged that TBI forensic scientists may "lose their jobs if they falsify test results and these falsifications are discovered," it dismissed this fact as insignificant because "forensic scientists would most certainly lose their jobs if funding for their positions disappears, a result of which these forensic scientists are no doubt well aware." Decosimo, 2018 WL 733218, at *17. The intermediate appellate court held the BADT fee statute unconstitutional, declaring that it "calls into question the trustworthiness of the TBI forensic scientists' test results" and "violates due process." Id. To remedy this constitutional violation, the Court of Criminal Appeals reversed the trial court, granted the defendant's motion to suppress the results of the TBI blood alcohol testing, and dismissed the DUI per se charge to which the defendant had entered a nolo contendere plea. Id. at *17-18.

The State then filed an application for permission to appeal, which this Court granted. Thereafter, this Court directed the parties to file supplemental briefs addressing whether the constitutional challenge to the BADT fee statute had been rendered moot by 2018 legislation amending that statute. See State v. Decosimo, No. E2017-00696-SC-R11-CD (Tenn. May 11, 2018) (order directing supplemental briefing). The 2018 legislation, which became effective May 21, 2018, abolishes the Intoxicant Testing Fund and provides for depositing BADT fees in the State's general fund for appropriation as the General Assembly determines. See 2018 Tenn. Pub. Acts, ch. 1044, §§ 3, 4.

Both parties argued in their supplemental briefs that this appeal had not been rendered moot because the 2018 legislation does not apply to the defendant's appeal, which is governed by the BADT fee statute existing before the 2018 legislation became effective. We agree and will analyze the BADT fee statute as it existed prior to the 2018 legislation.[10]

---

[10] We note, however, that the defendant has stated throughout this litigation, including in her supplemental brief and again at oral argument before this Court, that amending the statute to deposit BADT fees in the State's general fund rather than earmarking BADT fees to the TBI would eliminate the basis of her constitutional challenge. The 2018 legislation revised the BADT statute in precisely this manner.

- 13 -

## II. Standard of Review

The issue in this appeal—whether a statute is constitutional—is a question of law to which de novo review applies. Hughes v. Tenn. Bd. of Prob. and Parole, 514 S.W.3d 707, 712 (Tenn. 2017). We afford no deference to the legal conclusions of the courts below. Creech v. Addington, 281 S.W.3d 363, 372 (Tenn. 2009). We "start with a strong presumption that acts passed by the legislature are constitutional." Lynch v. City of Jellico, 205 S.W.3d 384, 390 (Tenn. 2006). We "'indulge every presumption and resolve every doubt in favor of the statute's constitutionality.'" Gallaher v. Elam, 104 S.W.3d 455, 459 (Tenn. 2003) (quoting State v. Taylor, 70 S.W.3d 717, 721 (Tenn. 2002)). This presumption applies with even greater force when, as here, the facial constitutional validity of a statute is challenged. Id.

## III. Analysis

The federal and state constitutions explicitly guarantee the right to due process of law. The Fourteenth Amendment to the United States Constitution prohibits the deprivation of "life, liberty, or property without due process of law." U.S. Const. amend. XIV. Article I, section 8 of the Tennessee Constitution provides that "no man shall be taken or imprisoned, or disseized of his freehold, liberties, or privileges . . . or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land." Tenn. Const. art. I, § 8. These constitutional provisions have been described as "synonymous" in the scope of protection they afford. Gallaher, 104 S.W.3d at 463. The same analysis therefore applies to the defendant's state and federal constitutions claims.

"[O]ne of the most basic due process requirements is a fair trial in a fair tribunal." State v. White, 362 S.W.3d 559, 566 (Tenn. 2012). This right "entitles a person to an impartial and disinterested tribunal in both civil and criminal cases." Marshall v. Jerrico, Inc., 446 U.S. 238, 242 (1980). In criminal cases, the denial of the right to an impartial tribunal is a structural constitutional error that requires automatic reversal. Smith v. State, 357 S.W.3d 322, 342-43 (Tenn. 2011); State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008). Such errors defy harmless error analysis, and a defendant is not required to establish prejudice. Smith, 357 S.W.3d at 342-43. The defendant alleges that the BADT fee statute denies her of the state and federal constitutional right to a fair and impartial tribunal by giving TBI forensic scientists both a personal and an institutional financial incentive to produce blood alcohol test results that will generate convictions and BADT fees.

Several United States Supreme Court decisions govern our analysis of this claim, beginning with a trilogy of decisions that arose from criminal trials in Ohio mayor courts

where the mayors also served as the judges.  See Tumey v. Ohio, 273 U.S. 510 (1927); Dugan v. Ohio, 277 U.S. 61 (1928); Ward v. Vill. of Monroeville, 409 U.S. 57 (1972).

In Tumey, the Supreme Court held that a statutory scheme providing a mayor-judge direct compensation for each conviction in his court violated due process.  The statutory scheme established a "liquor court," in which the mayor-judge adjudicated prohibition violations and imposed fines.  273 U.S. at 521.  The mayor-judge received a portion of each fine he imposed as compensation *in addition* to his salary.  Id. at 520.  He received this additional compensation *only* for convictions.  Id.  A substantial portion of the fines also were allocated for improvements and repairs to the village where the mayor-judge owned a house, id. at 521, and served as chief executive officer of the village, with the responsibility for managing village finances, id. at 533.

The Supreme Court held that this statutory scheme deprived Tumey of the right to a fair and impartial tribunal.  The Supreme Court explained that the mayor-judge had "a direct, personal, substantial pecuniary interest . . . in convicting the defendant who came before him for trial," 273 U.S. at 523, and also had an "official motive to convict and to graduate the fine to help the financial needs of the village," id. at 535.  Not only did the Supreme Court strike down the statutes at issue in Tumey, but it also announced the following test for evaluating such due process claims in future cases:

> [e]very procedure which would offer a possible temptation to *the average man as a judge* to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear, and true between the state and the accused denies the latter due process of law.

Tumey, 273 U.S. at 532 (emphasis added).  The Supreme Court observed that "[a] situation in which an official . . . occupies two practically and seriously inconsistent positions, one partisan *and the other judicial*, necessarily involves a lack of due process of law in the trial of defendants charged with crimes before him."  Id. at 534 (emphasis added).

The Supreme Court revisited the issue one year later in Dugan.  There, the city where the mayor-judge served operated under "a commission form of government, with five commissioners."  277 U.S. at 63.  The mayor-judge served as a member of the commission, but unlike the mayor-judge in Tumey, in Dugan the mayor-judge had no executive authority.  Id.  A city manager served as the city's "active executive," and the commission, of which the mayor-judge was only a member, exercised "all the legislative power of the city."  Id.  The mayor-judge had primary individual responsibility for judicial functions, and he received a fixed salary set by the four other members of the city's commission.  Id.  The Dugan mayor-judge's salary was not dependent at all on his judicial responsibilities, unlike the mayor-judge in Tumey.  Id. at 65.  The Supreme Court

acknowledged that the mayor-judge's salary was paid from a general fund into which fines imposed in his court were deposited, but the Supreme Court emphasized that the Dugan mayor-judge's failure to convict did not "deprive him of or affect his fixed compensation" and that he did not have executive responsibility for the finances of the city. Id. The Supreme Court concluded that the Dugan mayor-judge's alleged financial interests were too "remote" to constitute a violation of the defendant's due process right to a fair trial in a fair tribunal. Id.; see also Ward, 409 U.S. at 60-61 (stating that the Dugan mayor-judge's "relationship to the finances and financial policy of the city was too remote to warrant a presumption of bias toward conviction in prosecutions before him as judge"). See also Long v. Bd. of Prof'l Responsibility, 435 S.W.3d 174, 188-89 (Tenn. 2014) (rejecting a due process challenge to lawyer-disciplinary proceedings because the members of the hearing panel that imposed the discipline "receive[d] no compensation" and "ha[d] no responsibility for the budget or the finances" of the Board of Professional Responsibility).

Almost fifty years after Dugan, the Supreme Court decided Ward. 409 U.S. at 57. The mayor-judge in Ward had broad executive powers, exercised overall supervision of village affairs, and accounted annually to the village council about village finances. Id. at 58. A substantial part of village income derived from fines, forfeitures, costs, and fees the mayor-judge imposed in his court. Id. But, unlike the mayor-judge in Tumey, the mayor-judge in Ward did not personally receive any portion of the fees as compensation. Id. at 60. Nevertheless, focusing on the second part of the test announced in Tumey, the Supreme Court in Ward held that the mayor-judge's interest in city finances was sufficient to deprive the defendant of his right to an impartial tribunal. The Supreme Court explained:

> "[P]ossible temptation" may also exist when the mayor's executive responsibilities for village finances may make him partisan to maintain the high level of contribution from the mayor's court. This, too, is a "situation in which an official . . . occupies two practically and seriously inconsistent positions, one partisan and the other judicial, (and) necessarily involves a lack of due process of law in the trial of defendants charged with crimes before him."

Id. at 60 (quoting Tumey, 273 U.S. at 534). See also Gibson v. Berryhill, 411 U.S. 564, 579 (1973) (holding that an administrative board composed of optometrists had a pecuniary interest of "sufficient substance" so that it did not constitute a fair and impartial tribunal to preside over a hearing against competing optometrists).

Five years later, the Supreme Court applied the Tumey principle in Connally v. Georgia, 429 U.S. 245 (1977) (per curiam). The Georgia statute at issue in Connally compensated justices of the peace when search warrants were issued but provided no

compensation when search warrant applications were denied.  Id. at 246.  The justices of the peace were not salaried, so their "financial welfare" depended on issuing search warrants.  Id. at 250.  The Supreme Court struck down the statute, comparing it to Tumey and Ward and describing it as "another situation where the defendant is subjected to what surely is *judicial action* by an officer of a court who has 'a direct, personal, substantial, pecuniary interest' in his conclusion to issue or to deny the warrant."  Id. (quoting Tumey, 273 U.S. at 523) (emphasis added).    See also  In re Dender, 571 S.W.2d 491, 492 (Tenn. 1978) (holding that the issuance of an arrest warrant "by a non-salaried justice of the peace" who received compensation for issuing the warrant violates due process).

In the foregoing cases in which the Supreme Court found a due process violation, the persons responsible for adjudicating a case or determining whether a legal standard had been satisfied for issuance of a warrant had a direct, personal, substantial pecuniary interest in reaching an outcome adverse to the person raising the constitutional challenge. In other words, the direct, personal, and substantial pecuniary interest was held by persons exercising judicial authority.  Indeed, only three years after Connally, the Supreme Court explained that the strict due process impartiality standards of Tumey and its progeny apply only to persons exercising judicial or quasi-judicial authority. Marshall, 446 U.S. at 248.

At issue in Marshall was a due process challenge to a portion of the Fair Labor Standards Act pertaining to the enforcement of federal child labor law provisions.  Id. at 240.   The Secretary of the Department of Labor had designated the Employment Standards Administration ("ESA") as the agency responsible for enforcing these child labor law provisions.  Id. The ESA elected to fulfill its responsibilities through its regional offices, and "the assistant regional administrator of each office ha[d] been charged with the duty of determining violations and assessing penalties."  Id.  Another provision of the law provided that any civil penalties assessed for child labor law violations would be returned to the ESA as reimbursement for the costs.  Id. at 239.  In Marshall, the provision returning civil penalties to the ESA was challenged as creating "an impermissible risk and appearance of bias by encouraging the assistant regional administrator to make unduly numerous and large assessments of civil penalties."  Id. at 241.

In analyzing this claim, the Supreme Court first emphasized that it had "jealously guarded" the due process requirement of an impartial and disinterested judge.  446 U.S. at 242.   But it rejected the constitutional challenge, explaining "that the strict requirements of Tumey and Ward are not applicable to the determinations of the assistant regional administrator, whose functions resemble those of a prosecutor more closely than those of a judge."  Id. at 243.  The Supreme Court clarified that the Tumey requirements are "designed for officials performing judicial or quasi-judicial functions" and "are not applicable to those acting in a prosecutorial or plaintiff-like capacity."  Id. at 248.  The

- 17 -

Supreme Court observed that Tumey had "explicitly" recognized this "distinction between judicial and nonjudicial officers" when it declared that state legislatures "'may, and often ought to, stimulate prosecutions for crime by offering to those who shall initiate and carry on such prosecutions rewards for thus acting in the interest of the State and the people.'" Id. at 249 (quoting Tumey, 273 U.S. at 535).

The Supreme Court refused to equate the assistant regional administrator in Marshall with the decision makers in Tumey and its progeny, explaining:

> He is not a judge. He performs no judicial or quasi-judicial functions. He hears no witnesses and rules on no disputed factual or legal questions. The function of assessing a violation is akin to that of a prosecutor or civil plaintiff. If the employer excepts to a penalty—as he has a statutory right to do—he is entitled to a de novo hearing before an administrative law judge. In that hearing the assistant regional administrator acts as the complaining party and bears the burden of proof on contested issues. Indeed, the Secretary's regulations state that the notice of penalty assessment and the employer's exception "shall, respectively be given the effect of a complaint and answer thereto for purposes of the administrative proceeding." It is the administrative law judge, not the assistant regional administrator, who performs the function of adjudicating child labor violations.

446 U.S. at 247-48 (footnote and citations omitted).

Although the Supreme Court refused to apply the Tumey requirements, it also declined to hold "that the Due Process Clause imposes no limits on the partisanship of administrative prosecutors." Id. at 249. The Supreme Court referred to earlier decisions holding that courts may scrutinize "enforcement decisions of an administrator" if the decisions "were motivated by improper factors or were otherwise contrary to law." Id. (citing Dunlop v. Bachowski, 421 U.S. 560, 567, n. 7 (1975); Rochester Tel. Corp. v. United States, 307 U.S. 125 (1939)). The Supreme Court posited that "[a] scheme injecting a personal interest, financial or otherwise, into the enforcement process may bring irrelevant or impermissible factors into the prosecutorial decision and in some contexts raise serious constitutional questions." Marshall, 446 U.S. at 249-50 (citing Bordenkircher v. Hayes, 434 U.S. 357, 365 (1978)). Nevertheless, the Supreme Court declared that "the strict requirements of neutrality cannot be the same for administrative prosecutors as for judges, whose duty it is to make the final decision and whose impartiality serves as the ultimate guarantee of a fair and meaningful proceeding in our constitutional regime." Marshall, 446 U.S. at 250.

The Supreme Court found it unnecessary in <u>Marshall</u> to determine "with precision what limits there may be on a financial or personal interest of one who performs a prosecutorial function" because "the influence alleged to impose bias [was] exceptionally remote." 446 U.S. at 250. The Supreme Court pointed out that no government official stood "to profit economically from vigorous enforcement of the child labor provisions," and that "[t]he salary of the assistant regional administrator [was] fixed by law" and not dependent on the imposition of civil penalties. <u>Id.</u> The type of personal, direct, substantial pecuniary interests at stake in <u>Tumey</u> and <u>Connally</u> were, thus, "entirely absent" in <u>Marshall</u>. <u>Id.</u>

The Supreme Court also found no "realistic possibility that the assistant regional administrator's judgment w[ould] be distorted by the prospect of institutional gain as a result of zealous enforcement efforts," pointing out that civil penalties represented "substantially less" than one percent of the ESA budget. <u>Id.</u> The Supreme Court also noted that the ESA national office, not any assistant regional administrator, controlled the allocation of civil penalties, so no assistant regional administrator had any assurance that the civil penalties they assessed would be returned to their offices at all. <u>Id.</u> at 251. Ultimately, the Supreme Court declared that, "[u]nlike in <u>Ward</u> and <u>Tumey</u>, it is plain that the enforcing agent is in no sense financially dependent on the maintenance of a high level of penalties." <u>Id.</u> at 251.

Having examined these Supreme Court decisions, we first conclude that, like the assistant regional administrator in <u>Marshall</u>, the TBI forensic scientists in this case "simply cannot be equated with the kind of decisionmakers" to which the strict due process requirements of <u>Tumey</u> and its progeny apply. TBI forensic scientists are not judges. They do not perform judicial or quasi-judicial functions. They do not hear witnesses or rule on disputed factual or legal questions or determine guilt or innocence. Judges and jurors perform these tasks. Indeed, their responsibilities are much more different from persons exercising judicial authority than were the responsibilities of the assistant regional administrator in <u>Marshall</u>. For example, TBI forensic scientists have absolutely no control over procuring evidence, making arrests, or initiating prosecutions. They simply perform scientific tests on evidence samples submitted to them by law enforcement. Law enforcement officers make arrests. Unlike judicial officials and prosecutors, TBI forensic scientists exercise "minimal, if any interpretation or opinion" when conducting blood alcohol testing. They are required to conduct scientific tests in accordance with uniform procedures and standards the TBI forensic services division is required by statute to adopt. <u>See</u> Tenn. Code Ann. § 38-6-103(g). It is true that the results of tests TBI forensic scientists perform are prima facie admissible in judicial and quasi-judicial proceedings, but only insofar as the tests have been performed in compliance with the applicable uniform standards and procedures and also "*subject to the rules of evidence as administered by the courts.*" <u>Id.</u> (emphasis added). For all these reasons, we conclude that TBI forensic scientists are not judicial officials to whom the

- 19 -

Tumey requirements apply and are at least one step farther removed from having adjudicatory responsibilities than are prosecutors and the assistant regional administrator in Marshall. This distinction alone is a sufficient basis for rejecting the defendant's constitutional challenge to the BADT fee statute. See Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust, 508 U.S. 602, 619 (1993) (applying Marshall in a subsequent case and stating that the "distinction between adjudication and enforcement disposes of the [defendant's] claim that the assumed bias or appearance of bias . . . alone violates the Due Process Clause"); Long, 435 S.W.3d at 187–88 (rejecting an attorney's argument that Tennessee Supreme Court Rule 9 "creates a financial incentive" for the Board of Professional Responsibility "to initiate formal disciplinary proceedings" and "results in an 'institutional bias' in favor of finding the respondent guilty of misconduct and imposing a disciplinary sanction" and distinguishing Tumey, Ward, and Connally); Brown v. Edwards, 721 F.2d 1442, 1451 (5th Cir. 1984) (rejecting a constitutional challenge to a Mississippi statute by which constables received a fee for each charge that resulted in a conviction and describing Tumey, Ward, and Connally as "fundamentally distinct" because they all "involved a form of judicial action"); Henley v. State, 41 S.W. 352, 360 (Tenn. 1897) (upholding a statute providing for paying fees to officers and witnesses only upon conviction on the grounds that "[t]here is no [constitutional] provision for impartial sheriffs or impartial clerks or impartial witnesses" and stating that "under this act the court and jury are left impartial as before; nothing that affects them is left to depend upon the result of the trial").

By not extending the Tumey "strict requirements of neutrality" to TBI forensic scientists, we are not holding that due process imposes no limits at all. Marshall, 446 U.S. at 249. Like the Supreme Court in Marshall, we simply need not determine "with precision" in this appeal what, if any, due process "limits there may be on a financial or personal interest of one who performs" forensic scientific testing because the financial "influence alleged to impose bias" here is "exceptionally remote." Id. at 250. Indeed, the alleged financial interest is so remote that the defendant's constitutional challenge cannot prevail even under the strict Tumey requirements.

The defendant has not and cannot establish that the BADT fee statute provides TBI forensic scientists with a "direct, personal, substantial pecuniary interest in reaching a conclusion against [the defendant]" in a particular case. Ward, 409 U.S. at 60 (quoting Tumey, 273 U.S. at 523). TBI forensic scientists are salaried employees. Their compensation is not at all dependent on the results of blood alcohol tests or whether a particular defendant is or is not convicted. Nor do their salaries decrease or increase based on the aggregate amount of BADT fees imposed or collected. These facts alone illustrate that TBI forensic scientists do not have a personal, direct, substantial pecuniary interest in producing a particular test result. See In re Dender, 571 S.W.2d at 492 (stating that the Tumey principle "has no application to salaried public officials or employees whose personal compensation is not enhanced by the issuance of warrants or prejudiced

- 20 -

by failure to issue" and noting that the <u>Tumey</u> requirements address "[t]he evil" that "arises solely in the context of the non-salaried personnel having a direct, personal pecuniary interest").

The defendant also has failed to show "a realistic possibility that the [TBI forensic scientist's] judgment will be distorted by the prospect of institutional gain . . . ." <u>Marshall</u>, 446 U.S. at 250. The Court of Criminal Appeals based its ruling on the premise that TBI forensic scientists have an institutional financial incentive to increase BADT fees to generate funding for the TBI and secure their positions. <u>Decosimo</u>, 2018 WL 733218, at *16. The record does contain proof that increasing the BADT fee from $100 to $250 allowed the TBI to avoid laying off eight forensic scientists, but, like the mayor in <u>Dugan</u> and unlike the mayor in <u>Ward</u>, the TBI forensic scientists had no management authority or "executive power[]" to determine how increased BADT fees would be allocated. Indeed, despite the defendant's emphasis of the fact that BADT fees are deposited into the Intoxicant Toxicant Testing Fund and do not revert to the State's general fund, we note that the BADT fee statute requires the monies to "be invested pursuant to [Tennessee Code Annotated section] 9-4-603" and "remain available for appropriation to the Tennessee bureau of investigation, *as determined by the [G]eneral [A]ssembly.*" Tenn. Code Ann. § 55-10-413(f)(3)(B) (emphasis added). This statutory provision indicates that the General Assembly, rather than the TBI director, retained ultimate control over appropriating these funds to the TBI and determining the uses to which the TBI could put these funds. Indeed, the BADT fee statute describes many purposes for which the Intoxicant Testing Fund may be used, in addition to hiring and retaining TBI forensic scientists. The proof also indicates that BADT fees were indeed used to fund operations in all divisions of the TBI, not just the forensic services division.

More importantly, unlike the mayor-judges in <u>Tumey</u> and <u>Ward</u> and the justice of the peace in <u>Connally</u>, TBI forensic scientists have no control whatsoever over the imposition or collection of BADT fees. As already noted, TBI forensic scientists do not make arrests. Although they perform scientific tests on evidence, they do so pursuant to statutorily mandated uniform standards and procedures and utilize scientific equipment that produces results that do not depend upon the subjective judgments of the TBI forensic scientists. Although they report the results of scientific testing to law enforcement, TBI forensic scientists do not decide whether criminal charges are brought. If criminal charges are brought, TBI forensic scientists do not determine whether an offense to which the BADT fee statute applies will or will not be charged. If a BADT fee statute offense is charged, TBI forensic scientists do not decide whether a defendant will be allowed to plead guilty to a lesser or different criminal offense. All of these tasks are performed by prosecutors.

Even if a defendant is charged with an offense to which the BADT fee statute applies, TBI forensic scientists have no control over when the case will be resolved.

Indeed, many months, or even years, may pass between a TBI forensic scientist reporting the results of blood alcohol testing and a trial or plea that resolves the case with conviction of an offense that triggers *imposition* of a BADT fee. Even if a TBI forensic scientist could predict when a case would be resolved by a conviction, the TBI forensic scientist cannot predict when, or even if, a BADT fee will be collected. The record clearly establishes that not even the TBI can predict how many BADT fees actually will be collected in any given year, regardless of how many have been imposed. The record also establishes that some BADT fees are paid by installments or never paid at all, when defendants are indigent. Given the lack of control TBI forensic scientists have over the lengthy and uncertain processes that must occur after blood alcohol test results are reported before any BADT fees are imposed or collected, any institutional financial incentive the BADT fee statute creates is far too remote to qualify as a possible temptation to a reasonable TBI forensic scientist to manipulate blood alcohol test results. Indeed, such a remote institutional financial incentive is far outweighed by the personal, direct, and substantial pecuniary financial interest that salaried TBI forensic scientists have in continued employment. See also Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 825-26 (1986) (holding that the due process right to an impartial tribunal was violated when a state supreme court justice cast the deciding vote to uphold a punitive damages award against an insurance company for bad-faith refusal to pay a claim when, at the time of his vote, the justice was the lead plaintiff in a nearly identical potential class action lawsuit pending in a state trial court, *but also holding that the pecuniary interests six other justices had as potential members of the same class action were "too remote and insubstantial to violate the constitutional constraints"* (emphasis added) (internal quotation marks omitted.))

As the State points out, a TBI forensic scientist's continued employment depends much more heavily on the forensic scientist's accurate, objective job performance than on any institutional financial incentive to produce test results that increase convictions and generate BADT fees that may or may not be allocated to the forensic services division. Indeed, the record on appeal illustrates that mistakes, even a single mistake, may well lead to a TBI forensic scientist's dismissal and may result in substantial administrative costs to the TBI for retesting samples initially tested by the dismissed forensic scientist. The TBI as an institution and individual TBI forensic scientists have much more to lose than to gain by altering or fabricating evidence in an attempt to increase convictions and generate BADT fees.

With the availability of independent testing, the uniform scientific standards applicable to the TBI's forensic testing, the TBI's internal review mechanisms, and the TBI's response to a forensic scientist who made a mistake, it strains logic to suggest that a reasonable forensic scientist would engage in criminal, unethical, and career-ending conduct to alter or fabricate forensic scientific test results on the hope that: (1) the test results *might* lead to criminal charges of a BADT fee offense; (2) the criminal charges

*might* result in conviction of a BADT fee offense; (3) the BADT fee *might* be collected expeditiously; (4) the TBI director *might* use BADT fees to retain the TBI forensic scientist instead of using the monies for some other statutorily permissible purpose; and (5) the General Assembly will not appropriate the BADT fees to another purpose within the TBI. Indeed, only an irrational and unreasonable TBI forensic scientist would risk losing a salaried position and continued employment in this manner when BADT fees amount to less than five percent of the TBI's overall budget.[11] In summary then, even applying the rigid Tumey requirements, any institutional financial incentive the BADT fee statute creates is far too remote to constitute a possible temptation to any reasonable forensic scientist to manipulate or falsify test results to increase conviction rates and generate BADT fees.

The defendant urges us to hold that the Tennessee Constitution provides greater protection than the United States Constitution and entitles her to relief on her due process claim.[12] This Court is the final arbiter of the Tennessee Constitution and may interpret state constitutional provisions more broadly than corresponding provisions of the United States Constitution. State v. Watkins, 362 S.W.3d 530, 554 (Tenn. 2012). This Court typically departs from federal interpretations of similar constitutional provisions where appropriate interpretive grounds, such as textual differences or historical context, support such different interpretations. Id. at 555. As already noted, however, this Court has stated that the Fourteenth Amendment to the United States Constitution and article I, section 8 are "synonymous" in the scope of protection they afford. Gallaher, 104 S.W.3d at 463. The defendant has not pointed to any textual, historical, or other basis that supports interpreting them differently in this context. Additionally, the defendant has failed to point to a single decision in Tennessee or elsewhere granting relief under either a state or federal constitutional due process provision on a similar due process challenge.[13] The

---

[11] We also note the long line of Tennessee authority recognizing "that public officials in Tennessee are presumed to discharge their duties in good faith and in accordance with the law." West v. Schofield, 460 S.W.3d 113, 131 (Tenn. 2015); see also Reeder v. Holt, 418 S.W.2d 249, 252 (Tenn. 1967); Mayes v. Bailey, 352 S.W.2d 220, 223 (Tenn. 1961).

[12] We will address the defendant's argument on this point out of an abundance of caution although it is not clear from the record that this issue was raised in the courts below or encompassed within the single certified question of law from which this appeal arises.

[13] In a supplemental letter brief filed after oral argument, the defendant cited a Massachusetts case in which a chemist actually altered test results, Commonwealth v. Scott, 5 N.E.3d 530 (Mass. 2014), and a Texas decision—designated not for publication and not for citation as authority—in which a forensic scientist's failure to follow accepted standards rendered the test results unreliable, Ex parte Jackson, No. AP-77,008, 2013 WL 1232325 (Tex. Crim. App. Mar. 27, 2013). These decisions involved actual misconduct, while the defendant's due process claim is based on an allegation that, even in the absence of misconduct or mistake, the BADT fee statute gives rise to an appearance of impropriety by giving TBI forensic scientists a financial incentive to alter or falsify blood alcohol test results to generate

- 23 -

two cases we have discovered through independent research rejected similar federal due process challenges to statutes earmarking fines for certain purposes.

For example, the United States Court of Appeals for the Ninth Circuit considered "whether a statute of the Commonwealth of the Northern Mariana Islands (CNMI) that earmark[ed] civil and criminal fines imposed by the courts for a judicial building fund" deprived the defendant of due process of law in violation of the Fourteenth Amendment when he was fined by a judge of the CNMI superior court. Northern Mariana Islands v. Kaipat, 94 F.3d 574, 574 (9th Cir. 1996). The Ninth Circuit concluded that the defendant had failed to establish a due process violation under Tumey and its progeny. Id. at 575. In concluding that the superior court judge had no "direct, personal, substantial, pecuniary interest in reaching a conclusion against" the defendant, id. at 580 (quoting Tumey, 273 U.S. at 523), the Ninth Circuit pointed out that the judge received a fixed salary and had a fixed tenure unaffected by the rate at which defendants were convicted and fined. Id. It also noted that the judge exercised judicial functions only, had no executive responsibility for raising revenue, and had no control over how the monies in the judicial building fund were spent. Id. at 581. The Ninth Circuit emphasized too that, while the fines had been earmarked to the judicial building fund, "the legislature could just as easily have decided, or . . . could decide at any time, to earmark these same fees and fines" for other purposes. Id. The Ninth Circuit acknowledged that "judges are only human and (along with the public, litigants and attorneys) will no doubt welcome courthouse facilities that are more comfortable, efficient and secure-if and when they are built and if the judges are still in office to serve in them." Id. But, it ultimately concluded that "this kind of interest is too contingent and speculative and insubstantial to constitute the direct stake in the outcome of a case that is constitutionally infirm." Id. The Ninth Circuit concluded that it was "not reasonable to assume that a CNMI judge might be tempted to impose a fine, or to impose a higher fine, to enhance the prospects of building a building or building a building sooner rather than later." Id.

An Arizona appellate court reversed a trial court's ruling that a statute providing for "payment of fines for drug-related offenses to the drug enforcement fund" violated the defendant's "[federal] due process right to a fair and impartial adjudication of guilt when the sentencing judge's court is funded in part with monies from the drug enforcement fund." State v. Conlin, 832 P.2d 225, 225 (Ariz. Ct. App. 1992). While the Arizona court applied the Tumey requirements, it rejected the defendant's due process challenge, stating "that a superior court judge whose court is funded with monies from the drug enforcement fund does not have a 'direct, personal, substantial, pecuniary interest' in assessing the fine" for drug-related offenses. Id. at 228. In so holding, the Arizona court pointed out that judges did not "control expenditures from the drug enforcement account," that judges received a salary fixed by statute and not dependent on

_____

convictions and BADT fees. Decisions involving actual misconduct or mistake are not instructive on the defendant's constitutional challenge.

fines levied in criminal cases, and that judges were not responsible for the executive function of raising revenue. Id.

In summary then, the defendant has provided no authority from this State or elsewhere to support her assertion that article I, section 8 of the Tennessee Constitution should be interpreted as providing greater protection than the Fourteenth Amendment, as interpreted in Tumey and its progeny. Nor has she described any other persuasive interpretive basis for holding that the Tennessee Constitution provides greater protection in this context.

In rejecting the defendant's due process challenge, we disagree with the Court of Criminal Appeals' conclusion that the BADT fee statute creates a situation analogous to that of paying expert witnesses contingency fees. As we have already emphasized, TBI forensic scientists receive salaries not dependent in any way on whether the results of the forensic tests they perform produce convictions and generate BADT fees. The BADT fee statute simply is not similar to an expert witness contingency fee arrangement.

We also disagree with the Court of Criminal Appeals that the BADT fee statute creates a situation that "closely resembles cases in which expert witnesses or attorneys have been disqualified for conflicts of interest." Decosimo, 2018 WL 733218, at *17. In one of the decisions cited by the Court of Criminal Appeals as support for this proposition, a forensic pathologist who had been employed as a defense expert in a civil case subsequently sought to testify on behalf of the State in a criminal prosecution of the previous client on the same matter. State v. Larkin, 443 S.W.3d 751, 801 (Tenn. Crim. App. 2013).[14] In the second case, the attorney left a firm where he had worked while representing one party to a lawsuit and went to work for a firm that was representing the opposing party of the same lawsuit. Analogizing to baseball, this Court stated that the lawyer had "not only switched teams, he ha[d] switched teams in the middle of the game after learning the signals" and that the "new team" "bench[ing]" the lawyer was insufficient "to ameliorate the public perception of an unfair game." Clinard v. Blackwood, 46 S.W.3d 177, 188 (Tenn. 2001). This appeal involves neither scenario. It involves only a facial constitutional challenge to a statute based on an allegation that the BADT fee statute creates financial incentives for the TBI, and in particular TBI forensic scientists, to provide blood alcohol test results that produce convictions and generate BADT fees. As already explained, this allegation lacks merit for three reasons: (1) the Tumey requirements of neutrality that govern the due process analysis under both the

_____

[14] Moreover, the Larkin court set forth an applicable legal framework that should be used to analyze such cases. Id. at 798-801. The Larkin court then applied that legal framework to the facts of that case. Id. at 801-02. In the opinion below in this case, the Court of Criminal Appeals failed to identify any structural legal framework for its ultimate conclusion.

state and federal constitutions do not apply because the TBI forensic scientists do not exercise judicial or quasi-judicial functions; and (2) even evaluated against the strict Tumey requirements, the defendant's constitutional challenge fails because the BADT fee statute does not provide TBI forensic scientists with either a direct, personal, substantial pecuniary interest or a sufficiently substantial institutional financial incentive that qualifies as a possible temptation to any reasonable forensic scientist to falsify or alter test results to produce more convictions and BADT fees; and (3) the BADT fee statute does not create a situation comparable to an expert witness contingency fee arrangement.

Although we reject the defendant's constitutional claim, we acknowledge that the General Assembly could have devised a "more felicitious way" to provide funding. Kaipat, 94 F.3d at 575. Indeed, the Legislature has now done just that by amending the BADT fee statute, effective May 21, 2018. We applaud this timely action by the Legislature to eliminate the grounds on which the defendant based her claim of a statutory appearance of impropriety and her constitutional challenge. However, it remains our own judicial obligation to determine, based on relevant precedent, whether the statute deprives the defendant of due process guaranteed by both the federal and the state constitutions. We conclude that it does not.

We reiterate that this decision addresses only the statute that existed prior to May 21, 2018, the effective date of the legislation amending the BADT fee statute to eliminate the bases of the defendant's constitutional challenge. We note that this decision neither mandates nor precludes cross-examination of TBI forensic scientists about the BADT fee statute or the giving of a jury instruction regarding this issue. We leave the resolution of these matters to the sound discretion of trial judges to determine on a case-by-case basis.

## IV. Conclusion

For all these reasons, the judgment of the Court of Criminal Appeals is reversed, and the judgment of the trial court is reinstated. Costs of this appeal are taxed to the defendant, for which execution may, if necessary, issue.

_____
CORNELIA A. CLARK, JUSTICE