IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 28, 2018

## STATE OF TENNESSEE v. THOMAS HUEY LILES, JR.

**Appeal from the Circuit Court for Sevier County**
**No. 23167-II     James L. Gass, Judge**

_____

**No. E2018-00384-CCA-R3-CD**

_____

The defendant, Thomas Huey Liles, Jr., appeals his Sevier County Circuit Court jury
conviction of second offense driving under the influence ("DUI"), claiming that the
statute imposing a blood alcohol or drug concentration test fee violates principles of due
process. Because our supreme court has specifically concluded that the statute in
question does not violate due process principles, we affirm.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which THOMAS T.
WOODALL, and ROBERT W. WEDEMEYER, JJ., joined.

Aaron M. Kimsey, Sevierville, Tennessee, for the defendant, Thomas Huey Liles, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant
Attorney General; Jimmy Dunn, District Attorney General; and Brad Jones, Assistant
District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Sevier County Grand Jury charged the defendant, Thomas Huey Liles,
Jr., with one count each of reckless endangerment involving a deadly weapon, second
offense DUI, driving on a revoked license with DUI convictions, and violation of
financial responsibility laws. The defendant pleaded guilty to the driving on a revoked
license and financial responsibility charges, and those convictions are not at issue in this
appeal.

At the January 24, 2018 jury trial, Sevierville Police Department Officer
Justin Armstrong testified that he encountered the defendant on October 21, 2016, in
Sevierville. Other police officers were investigating a car accident involving the

defendant, and Officer Armstrong arrived to "proceed with the DUI investigation." Officer Armstrong stated that, during the investigation, the defendant's "pupils were . . . almost pinpoint. There was very little color to his pupils in his eyes. The black portion was very, very tight." Officer Armstrong explained that the size of one's pupils can indicate possible impairment. Officer Armstrong also observed that the defendant was "slumped over," "could not stand up straight," and smelled of alcohol. The defendant consented to Officer Armstrong's administering field sobriety tests. Officer Armstrong explained each test that he administered to the defendant and stated that the defendant "performed poorly" on the tests. He testified that the defendant was unable to successfully complete any of the tests and that his performance indicated impairment. The jury viewed a video recording of the defendant's performing the field sobriety tests and subsequent arrest. Officer Armstrong noted that, although the video recording showed raindrops on his car's windshield, he did "not believe that the rain affected the performance of the tests in any way" because "[t]he rain did not really pick up." Officer Armstrong also stated that he did "not believe that the wind played any factor in the defendant's performance on those tests."

Officer Armstrong arrested the defendant for DUI and obtained the defendant's written consent for a blood alcohol test. Another officer transported the defendant to LeConte Medical Center where the blood draw was performed.

On cross-examination, Officer Armstrong explained that, in demonstrating to the defendant how to do the one-leg stand test, he crossed his hands across his chest for his own protection. Officer Armstrong acknowledged that he placed his foot down early in demonstrating the test, which is a clue of intoxication if a subject does so, but stated that he was not intoxicated while demonstrating the test. Officer Armstrong testified that he contacted Deputy Jason Lewis, a drug recognition expert with the Sevier County Sheriff's Office, to "advise him what was going on," not because he wanted a second opinion on the defendant's level of impairment. Officer Armstrong "believe[d] the defendant to be impaired . . . off of alcohol as well as drugs" and knew that Deputy Lewis could conduct drug recognition testing on the defendant. Officer Armstrong acknowledged that in administering the walk-and-turn test, there was no visible line, and he agreed that his "imaginary line didn't match up with [the defendant's] imaginary line." He did not ask the defendant his level of education but did confirm that he could count to 30 and say the alphabet.

Officer Armstrong reiterated that he first encountered the defendant when he arrived to assist other officers with a vehicle accident. He "took over the DUI investigation" but did not work the accident investigation. He did not ask the defendant whether he had hit his head in the accident, but he checked the defendant's pupils and did

not see an indication of a concussion or a medical emergency. Officer Armstrong testified that the defendant told him first that he had not had anything to drink but later told him that he had had one beer. Officer Armstrong explained that the purpose of the modified Romberg test, in which he asked the defendant to tilt his head back, close his eyes, and estimate 30 seconds of time, was to determine whether the defendant could follow simple instructions and could estimate the passage of time. The defendant performed the test twice, estimating the passing of 30 seconds "within the limits."

On redirect examination, Officer Armstrong testified that, due to "time [and] officer safety," officers do not demonstrate the field sobriety tests in their entirety. He explained that he determined that the defendant was impaired and arrested him prior to contacting Deputy Lewis. The defendant did not have visible injuries when Officer Armstrong encountered him. Officer Armstrong reiterated that he "did not believe that there was any medical emergency" and that if there had been one, he would have ceased the criminal investigation and called for medical assistance. He testified that the defendant's behavior was inconsistent with a person who had had only one beer.

During recross-examination, Officer Armstrong testified that he makes observations during field sobriety tests that help him "articulate why [he] believe[s] there is impairment present." He explained that he was trained to not demonstrate the tests in their entirety for officer safety and time constraints. Two other officers were present during Officer Armstrong's DUI investigation; one officer was working the accident investigation and the other was acting as Officer Armstrong's "cover officer" focusing primarily on traffic management. Officer Armstrong testified that he demonstrated how to turn during the walk-and-turn test, but the defendant did not complete the turn as demonstrated.

Sevierville Police Department Lieutenant Rebecca Cowan testified that when she arrived at the crash scene, she observed a van and a pickup truck on the shoulder of the road. The defendant explained to her that the other driver stopped suddenly in front of him and that he hit the vehicle. Lieutenant Cowan determined that the defendant "was following improperly and could not stop in time." Lieutenant Cowan noted that the defendant was wearing sunglasses despite the sun's going down and the sky's being overcast and rainy. At first, a passenger in the defendant's vehicle said that she was the driver, but later the defendant admitted that he had been driving. When the defendant removed his sunglasses, Lieutenant Cowan noticed that "his eyes were constricted." The defendant "also had slow speech" and struggled to answer questions. Lieutenant Cowan continued working the accident investigation, and Officer Armstrong conducted the DUI investigation. After the defendant consented to a blood test, Lieutenant Cowan transported him to the hospital. During the ride to the hospital, the

defendant "started falling asleep and he would jerk his head back up." The defendant kept "asking the same questions over and over" and "said that he was [the] driver" but that the vehicle in front of him "stopped suddenly and he couldn't react . . . [and] he ended up hitting her." The jury watched a portion of a video recording of Lieutenant Cowan's interaction with the defendant during the ride to the hospital.

At the emergency room, the defendant "was kind of slumped over the door, propping himself on the door." Lieutenant Cowan testified that, while waiting for the blood draw at the hospital, the defendant told her "that he was just tired, he had had a long day, but he kept giving different stories and none of them added up time-wise." Lieutenant Cowan observed the defendant's blood being drawn by an employee at LeConte Medical Center. She then delivered the blood sample to the "evidence lockers for the evidence custodian," who, in turn, transported the sample to the Tennessee Bureau of Investigation ("TBI") for testing.

During cross-examination, Lieutenant Cowan described the damage to the vehicles as "minor damage" but "similar to what [she had] seen in stop-and-go-traffic." She testified that, although many suspects are attentive while being transported in a police car, the defendant was not. She explained that, while being transported to the hospital, the defendant "was asking questions about his vehicle and the occupants of the vehicle, where they were going to go. But most people are stressed about what's going to happen to them, you know, what their bond is going to be when they see a magistrate." Before arriving at the emergency room, the defendant "was quiet . . . and that's when he started nodding off."

On redirect examination, Lieutenant Cowan testified that the call regarding the car accident came in at 5:25 p.m., and she arrived on the scene at 5:30 p.m. She and the defendant left the hospital "around seven p.m. to take him back to the jail."

On recross-examination, Lieutenant Cowan testified that "[i]t was daylight but it had rained that day so there was an overcast" at the time of the accident. She agreed that, although drivers were required to use headlights and windshield wipers, "you could . . . still see."

Sevier County Sheriff Deputy Jason Lewis, who was certified as a drug recognition expert, testified that he was asked to evaluate the defendant for drug impairment, and he first met the defendant at the hospital where the defendant was getting his blood drawn. Deputy Lewis observed the defendant "sitting on a bench with his head back. He appeared to be almost asleep or on a nod"; however, the defendant "was able to respond quickly to [his] question." The defendant told Deputy Lewis that he

had had one beer to drink. After the defendant was transported to the jail, Deputy Lewis evaluated him. After advising the defendant of his *Miranda* rights, Deputy Lewis "beg[a]n questioning him about what he's eaten or drunken [sic] for the day," then took the defendant "through some of the same tests that are given roadside, but . . . also include[d] other tests that are specialized for drugs." The defendant's performance on these tests indicated to Deputy Lewis that the defendant "was too impaired to operate a motor vehicle safely." Next, Deputy Lewis checked the defendant's pupillary reaction to light, "vital signs, blood pressure, body temperature, . . . pulse rate," and "muscle tone," and looked for injection sites on the defendant's body. He explained that "[d]ifferent drugs have different effects on your body" and that the results of the physical examination can "show which drug category the subject could possibly be under." Deputy Lewis determined that the defendant's vital statistics "were all within normal range but on the lower end, which shows that his system may be depressed." Based on his evaluation, Deputy Lewis "believed [the defendant] was under the influence of alcohol or a depressant . . . and possibly a narcotic."

On cross-examination, Deputy Lewis testified that he was asked to assist in the investigation of this case by Officer Armstrong, who advised him "that there was a crash and he believed the subject was under the influence of something, possibly other than alcohol." Deputy Lewis explained that, when asked to estimate 30 seconds of time, the defendant's estimate was actually 25 seconds, which Deputy Lewis agreed was "within the normal range." When asked to touch the tip of his finger to his nose, the defendant incorrectly used the pad of his finger despite Deputy Lewis's demonstrating the correct movement. The defendant admitted to Deputy Lewis that he had consumed one beer "[a]t approximately 5:30."

During redirect examination, Deputy Lewis explained that he did not cease his evaluation of the defendant after the defendant estimated 30 seconds in an acceptable time because "[t]hese tests are not based on a single test. It's a totality of the circumstances." He stated that, when performing the sobriety tests, the defendant "followed instructions as best as he could" and that he allows subjects to perform a test more than once if they misunderstand the instructions.

On recross-examination, Deputy Lewis reiterated that the defendant's vital statistics were normal, but "[o]n the low end." Knowing that the defendant had been involved in a car accident, Deputy Lewis asked him if he was sick or injured, to which the defendant responded in the negative. The defendant informed Deputy Lewis that he had taken Benadryl, and Deputy Lewis acknowledged that Benadryl is "not one of the listed drugs that we're looking for," so Deputy Lewis could not determine from the tests whether the defendant was experiencing the effects of Benadryl. Deputy Lewis testified

that he found only "one needle mark on [the defendant's] arm which was from the blood draw from the hospital."

TBI Agent and Forensic Scientist Regina Aksanov, who was certified as an expert in toxicology, testified that "every [blood] sample that comes into the unit first gets an alcohol test." If a sample tests "below a .08, then that blood sample will go on further for drug testing." In this case, Agent Aksanov "performed the alcohol test and one of the drug tests" on the defendant's blood sample and determined that the defendant's blood contained "0.056 gram percent of ethyl alcohol" and "Alprazolam at 76 nanograms per milliliter." Agent Aksanov testified that a blood alcohol concentration of .056 "isn't incredibly high" but stated that "alcohol even at low levels can cause a degree of impairment to people" including impairment of vision. She acknowledged that the defendant's blood alcohol level was lower than Tennessee's .08 legal limit. Agent Aksanov testified that Alprazolam, also known as Xanax, "is also a central nervous system depressant so it's going to have the similar side effects that alcohol would because they're both doing the same thing to the body." Although the amount of Alprazolam in the defendant's blood was within the therapeutic range, it could nonetheless "cause side effects" including "drowsiness, lethargy, slurred speech, inability to concentrate well or make decisions, [and] inability to multitask well." Agent Aksanov explained that the presence of two central nervous system depressants together would "have additive effects" enhancing the side effects.

During cross-examination, Agent Aksanov testified that Alprazolam's half-life in a person's blood is, "anywhere from six to [27] hours; on average, about [11] hours," and its side effects may endure the entire time the drug is in one's system.

On redirect examination, Agent Aksanov clarified that the more of a drug that a person takes, "the longer it's going to take for it to completely clear out of your system." The amount of Alprazolam in the defendant's blood was "how much was in his system and . . . what was affecting him at that time."

The parties stipulated that Alprazolam is a schedule IV controlled substance.

Candy Mingie, a passenger in the back of the defendant's pickup at the time of the accident, testified, "There was two cars behind us, a minivan and a regular sedan, and they were both on their cell phones, and the lady in the sedan gave the lady in the minivan a thumbs up. She came around us and slammed on her brakes in front of us." Ms. Mingie stated that the stop light was green, "[t]here was no traffic at all," and the driver of the minivan slammed on her brakes "[w]ithout any reason to do so."

On cross-examination, Ms. Mingie testified that she was riding in the bed of the pickup "closer towards the tailgate." The sedan was behind the defendant's pickup, and the minivan was behind the sedan. Ms. Mingie reiterated that the drivers of both the sedan and the minivan were on their cellular telephones "and the lady in the sedan gave the lady in the minivan a thumbs up." The driver of the minivan then "whipped it" around to the front of the pickup and stopped. Ms. Mingie testified that the sedan did not hit the pickup, but the driver of the sedan "sat back there and laughed." She explained that she first told the police that she had been driving the pickup because she did not want the defendant to get in trouble.

Stephanie Hipshire testified that she was riding in the passenger's seat of the defendant's pickup at the time of the accident and described the events as follows:

> We were driving down Dolly Parton Parkway. We were almost right in front of the Hardee's and, there was a van that came around us and she got over in front of us. There was no vehicles in front of her. She slammed -- I mean, just immediately slammed on her brakes, and we went right into her.

Ms. Hipshire stated that she did not observe the defendant do anything reckless.

On cross-examination, Ms. Hipshire testified that she noticed the minivan driving behind the pickup from seeing it in the mirrors and "saw it come up beside us." The defendant was driving in the right-hand lane and the minivan passed them "from the left side." Ms. Hipshire recalled that she, the defendant, Ms. Mingie, the defendant's nephew, and another friend were riding in the pickup at the time of the accident. After the accident, Ms. Hipshire checked on the passengers in the minivan, but they would not speak with her until the police arrived.

The jury found the defendant guilty of DUI but not guilty of reckless endangerment with a deadly weapon. The jury did not reach a consensus on the lesser-included charge of reckless endangerment, and the State dismissed that charge. The parties stipulated that the defendant had previously been convicted of DUI and that the present conviction was for a second offense DUI. The trial court imposed a sentence of 11 months and 29 days to be served in split confinement.

The defendant timely moved for a new trial, claiming that "the use of blood tests done by the TBI violates the [d]efendant's rights to due process . . . because [Code

section] 55-10-413(f) creates a contingent-fee-dependent system." The trial court denied the defendant's motion for a new trial, finding "that there was sufficient proof presented at trial to support a jury verdict of guilty independently of the blood draw results or TBI testimony."

In this timely appeal, the defendant contends that the defendant's blood alcohol and toxicology reports were obtained via a statute deemed unconstitutional by this court. The State argues that the defendant waived plenary review of the issue by failing to raise it prior to trial and that, in any event, a recent decision by our supreme court undercuts the merits of the defendant's argument. We agree that, any waiver notwithstanding, the defendant's claim is without merit.

In *State v. Rosemary Decosimo*, this court examined the fee system in Code section 55-10-413(f) and concluded that it violated principles of due process. *State v. Rosemary Decosimo*, No. E2017-00696-CCA-R3-CD, slip op. at 27 (Tenn. Crim. App., Knoxville, Feb. 6, 2018), *overruled by State v. Decosimo*, 555 S.W.3d 494 (Tenn. 2018), *petition for cert. filed*, (U.S. Oct. 31, 2018). We held that even though TBI forensic scientists did not qualify as judicial or quasi-judicial officers under the test originally established in *Tumey v. Ohio*, 273 U.S. 510, 522 (1927), *see Rosemary Decosimo*, slip op. at 22, an "inherent conflict" existed "between the requirement that a forensic scientist be neutral and objective and Code section 55-10-413, which deposits the monies received from" forensic blood testing for the presence of drugs and alcohol "directly to the TBI, rather than the State general fund," *id.*, slip op. at 23. We observed that Code section 55-10-413(f) "create[d] a mechanism whereby the TBI forensic scientists have a pecuniary interest in BADT fees in the form of continued employment, salaries, equipment, and training within the TBI," and that this mechanism "calls into question the trustworthiness of the TBI forensic scientists' test results." *Id.*, slip op. at 28.

Recently, however, our supreme court overturned the ruling of this court, holding that the Code section 55-10-413(f) fee system did not deprive "the defendant of due process guaranteed by both the federal and the state constitutions." *Decosimo*, 555 S.W.3d at 516. The high court agreed with this court that "TBI forensic scientists do not exercise judicial or quasi-judicial functions," *id.*, but it concluded, contrary to the conclusions of this court, that the "fee statute does not provide TBI forensic scientists with either a direct, personal, substantial pecuniary interest or a sufficiently substantial institutional financial incentive that qualifies as a possible temptation to any reasonable forensic scientist to falsify or alter test results to produce more convictions" and "does not create a situation comparable to an expert witness contingency fee arrangement," *id.*

-8-

Given our supreme court's decision in *Decosimo*, the defendant cannot prevail upon the merits of his claim in this case. Accordingly, we affirm the judgment of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE